IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-50406

Summary Calendar

_____


CHRISTOPHER O. WOODRUFF,

Plaintiff - Appellant,

versus

PULTE HOME CORPORATION; PULTE HOME CORPORATION OF TEXAS

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. SA-97-CA-086 HG

_____

December 7, 1998

Before HIGGINBOTHAM, JONES, AND DENNIS, Circuit Judges.

PER CURIAM:[*]

    Christopher O. Woodruff, a former African-American employee of
Pulte Home Corporation and Pulte Home Corporation of Texas, filed
suit against Pulte alleging that he was illegally discriminated
against because of his race and retaliated against when he sought
to enforce his rights by filing a complaint with the Equal

_____

[*]Local rule 47.5 provides: "The publication of opinions that
have no precedential value and merely decide particular cases on
the basis of well-settled principles of law imposes needless
expense on the public and burdens on the legal profession."
Pursuant to that Rule, the Court has determined that this opinion
should not be published.

Employment Opportunity Commission. Woodruff asserted claims under Title VII, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code Ann. §§ 21.001-21.035. The district court granted summary judgment for Pulte on all claims. We affirm.

I

Woodruff was hired as a new home sales representative for the San Antonio division of Pulte in 1995, and he was the only African American sales representative in the division over the course of his employment. All supervising employees were white. Woodruff had no prior experience selling homes, and was assigned a trainer, Alex Rickel. Woodruff was required to turn over 20% of his commissions on his first 10 sales to Rickel even if Rickel was not directly involved in a particular sale. According to affidavits of individuals other than Woodruff, this requirement had not been imposed on other new hires previously, and a similarly inexperienced new employee hired after Woodruff, Humphrey Hassing, was not required to share commissions in this way. Another employee, Karen Hill, was required to split her commissions, but she was hired after Woodruff had submitted his initial complaint.

Woodruff filed an EEOC charge complaining of the practice, and one month later, Mike Mandola, the new San Antonio division president, and Frank Boley, the San Antonio sales manager, met with Woodruff to discuss his complaint. On behalf of Pulte, they offered to pay Woodruff fully for the portion of the commission that he had split with Rickel. They also offered to give Woodruff

2

an additional amount to compensate for a November, 1995, sale in which both he and Rickel had been involved, and had disagreed as to how to split the commission. Woodruff declined the offer, however, indicating that he did not want to condone illegal discriminatory conduct.

Woodruff alleges that Prude did not like him. Prude, he says, would discuss issues with other salespersons, but would not meet with Woodruff for more than a short period before kicking him out of the office. When Woodruff and Rickel had their commission dispute, Woodruff alleges that Prude met with Rickel but not with him. In addition, Woodruff maintains, Prude acted evasively when Woodruff talked to him, rolling his eyes and turning away from Woodruff. Further, Woodruff alleges that at a sales meeting, another salesperson, Jim Kucera, openly said that Woodruff was Pulte's "token" black, and Prude responded by smirking and rolling his eyes.

In July, 1995, Woodruff asked to be transferred to a potentially more lucrative subdivision, Greenbriar at Finesilver, but never received an answer, even though other employees who had requested transfers did receive responses. Continuing at the same location, Woodruff logged low sales figures initially and was placed on probation. He improved his sales performance, selling seven homes from January to April, 1996. This amount, however, was less than Prude's goal for Woodruff of selling two homes per month, which in turn was less than the number of homes that Woodruff had suggested as a self-imposed goal.

In June, 1996, Woodruff was given a choice of remaining at the Braun Heights subdivision at which he had been working or transferring to the Blanco Bluffs subdivision, to which about 13 non-African-American sales representatives were transferred over a three-year period. He chose to transfer. Woodruff wanted to work at Blanco Bluffs without a partner sales representative, but for several intervals totaling about three months, he was assigned a partner. For two additional brief periods, he was assigned a "retrainer," Carlos Fontanez. Woodruff complains that the Blanco Bluffs subdivision where they worked could support only one salesperson. From June to October, 1996, Woodruff sold only two homes, and in September, he was informed that his employment might be terminated if his sales record did not improve. In October, 1996, Woodruff was told that the Blanco Bluffs subdivision might be closed down altogether if aggregate sales did not increase.

In April, 1997, Woodruff took a vacation. In accordance with workplace practice, he secured the services of two "hostesses" to watch his model home while he was away. Woodruff complains that the Pulte sales director called one of the hostesses and told her that if any potential buyer showed interest, she should refer that buyer to another salesperson in another sales division, Laura Terranova. The hostess complied with this request.

The Blanco Bluffs subdivision was ultimately closed down and Woodruff's position was terminated. Overall, Woodruff filed five charges of discrimination with the EEOC that are before us here. In addition to the commission splitting, the failure of a manager

4

to respond to a transfer request, and the decisions regarding subdivision assignments and assignment of partners, Woodruff claims that he was discriminated against when Pulte earlier placed memos in his personnel file, and by virtue of Pulte's performance monitoring, probation, and evaluation programs.

## II

We will consider Woodruff's allegations of race discrimination and retaliation in turn. With respect to each allegation, Woodruff has failed to meet his burden. In some cases, he has failed to establish a prima facie case of discrimination. See, e.g., Waggoner v. City of Garland, 987 F.2d 1160, 1163-64 (5th Cir. 1993) (reciting the requirements for establishing a prima facie case of discrimination). In others, confronted with a legitimate, non-discriminatory reason for each action taken, he has failed to offer evidence that the reason is a mere pretext. See, e.g., Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 957 (5th Cir. 1993).[1] Because there is thus no genuine issue of material fact, summary judgment was proper. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."). Woodruff's conclusory allegations that employment actions were racially motivated cannot

---

[1]The standard for a retaliation claim under 42 U.S.C. § 2000e-3(a) is similar. See, e.g., Ray v. Tandem Computers, Inc., 63 F.3d 429, 435 n.22 (5th Cir. 1995).

prevent a summary judgment award.  See, e.g., Duffy v. Leading Edge Products, Inc., 44 F.3d 308, 312 (5th Cir. 1995).[2]

A.

Woodruff's strongest claim is that he was discriminated against when forced to pay 20% of his commission on his first ten sales.  Woodruff has met his prima facie burden, since Hassing was not expected to split his commissions.  Nonetheless, the employer has offered a legitimate business reason for the decision, that at the time it appeared to be sound business practice.  Cf. EEOC v. Louisiana Office of Community Servs., 47 F.3d 1438, 1448 (5th Cir. 1995) (noting that Title VII is "not intended to be a vehicle for judicial second guessing of business decisions, nor . . . to transform the courts into personnel managers").  Woodruff has not produced evidence that this reason was pretextual, and Pulte's offer to compensate him later provides evidence that it was not.  Because Woodruff is not a federal employee, he did not lose his Title VII claim on account of his refusal to accept this offer.  Cf. Brown v. General Servs. Admin., 425 U.S. 820, 832-33 (1976) (establishing a different rule for federal employees based on the administrative scheme established for resolving complaints of federal employees).  Nonetheless, the offer shows that Pulte

---

[2]We need directly consider only Title VII law.  Where a plaintiff alleges violations of both Title VII and § 1981, the latter claim is considered separately only if it is brought on grounds different from those available under Title VII.  See Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1575 (5th Cir. 1989).  The Texas Commission on Human Rights Act, meanwhile, is interpreted in conformance with Title VII.  See Dallas Fire Fighters Ass'n v. City of Dallas, 885 F. Supp. 915, 927 (N.D. Tex. 1995).

officials wished to ensure that Woodruff was being treated equally. Regardless of whether this wish stemmed from Pulte's desire to shield itself from legal liability, Woodruff has produced no evidence that the original plan was motivated by invidious discriminatory animus, and his claim thus cannot survive summary judgment.

Woodruff's claim that his supervisor's failure to respond to his request to transfer to Finesilver constituted discrimination has no basis in law. Insensitive and rude behavior do not constitute illegal discrimination, and "cold-shouldering" does not rise to the level of an actionable offense. See, e.g., McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563-64 (5th Cir. 1998). Pulte's decision not to transfer Woodruff also was not discriminatory. Pulte selected Bill Dugger, an experienced sales representative from outside Pulte, to work in this lucrative and important position. Dugger was clearly more qualified than Woodruff for the job, and Woodruff has produced no evidence that the selection was based on race.

Nor was Woodruff's placement in Blanco Bluffs discriminatory. Woodruff himself chose to transfer to Blanco Bluffs, and two other sales representatives were placed in low performing subdivisions and had low sales as a result of placement there. Approximately 13 sales representatives were assigned to Blanco Bluffs over three years. Woodruff has thus failed to establish a prima facie case of discrimination on this charge. Similarly, there is no evidence that the assignment of partners to Woodruff was discriminatory. A

7

sales representative assigned to Blanco Bluffs prior to Woodruff had approximately four partners assigned to work with her there, and during Woodruff's employment, most of the subdivisions had more than one sales representative assigned to each subdivision.

Woodruff's complaints about memos being placed in his file without his knowledge also cannot survive summary judgment. Other similarly situated sales representatives also had negative memos placed in their personnel files without their knowledge. Moreover, there is no evidence that these memos resulted in adverse action being taken with regard to his employment, and the memos themselves do not constitute an employment action.

With respect to performance monitoring, Woodruff has presented no evidence that he was treated differently from other employees with low sales.[3] And with respect to Woodruff's ultimate dismissal, he has presented no evidence that there was any discriminatory motive in Pulte's decision to close the Blanco Bluffs subdivision. "Job elimination or office consolidation is a sufficient nondiscriminatory reason for discharge." Armendariz v. Pinkerton Tobacco Co., 58 F.3d 144, 150 (5th Cir. 1995), cert. denied., 116 S. Ct. 709 (1996). The supervisors whose actions

---

[3]Similarly, Woodruff has presented no evidence that instructions to the hostess that he had selected to watch over his model home during vacation were discriminatorily motivated. In any event, this claim may be barred, because he did not mention it in his EEOC charge and thus has failed to exhaust administrative remedies. See Clark v. Kraft Foods, Inc., 18 F.3d 1278, 1280 n.9 (5th Cir. 1994) (noting that a civil action may encompass only claims stated in the EEOC charge, developed during the course of an investigation of that charge, or included in what the EEOC would reasonably be expected to investigate on account of the charge).

Woodruff complained about were not the same as those who ultimately approved the closing of Blanco Bluffs, and Woodruff thus cannot show that the closing was the result of continuing animus.

B.

Woodruff's first retaliation claim is that Pulte managers illegally interrogated him after he filed his EEOC charge. In Paxton v. Union National Bank, 688 F.2d 552 (8th Cir. 1982), an employee was called into the personnel director's office and questioned intensively about why he made an EEOC filing. The Eighth Circuit found this to be a violation of § 2000e-3. Assuming without deciding that we would take the same position as the Eighth Circuit if presented the facts in Paxton, Woodruff nevertheless has not produced evidence that he was intensively interrogated. The Pulte managers asked what they could do to correct any perceived discrimination, and ultimately offered to reimburse Woodruff his lost training commissions. This cannot constitute a retaliatory interrogation, for if it did, employers would be unable to remedy perceived discriminatory conduct without subjecting themselves to legal liability.

Woodruff also complains that documentation placed in his personnel file without his knowledge constitutes retaliation. Performance evaluations, however, do not constitute adverse employment actions. See, e.g., Mattern v. Eastman Kodak Co., 104 F.3d 702, 707-08 (5th Cir. 1997) (listing adverse employment actions as including only "ultimate employment decisions" like hiring, discharging, promoting, granting leave, and compensating).

9

Woodruff has offered no evidence establishing a causal connection between documentation in his personnel file and the ultimate decision to terminate him.  Similarly, the retraining Woodruff received did not constitute an adverse employment action and ultimately was not causally connected to his termination when the Blanco Bluffs subdivision closed.

III

For the reasons above, we affirm the district court's decision to enter summary judgment.

AFFIRMED.